FILED

2018 MAY 31 AM 9: 54

U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

RUSTEM KAZAZI; LEJLA KAZAZI; and
ERALD KAZAZI,

                     *Movants,*

    v.

U.S. CUSTOMS AND BORDER
PROTECTION; UNITED STATES OF
AMERICA; KEVIN McALEENAN,
Commissioner, U.S. Customs and Border
Protection, sued in his official capacity;
TIMOTHY STARK, agent of U.S. Customs
and Border Protection, sued in his individual
capacity; and UNKNOWN AGENTS OF U.S.
CUSTOMS AND BORDER PROTECTION,
sued in their individual capacities

                     *Respondents.*

**JUDGE POLSTER**

No. **1:18 MC** **51**

#1460100508

**RULE 41(g) MOTION FOR RETURN OF PROPERTY**

    This motion for return of property challenges the U.S. Customs and Border Protection's

("CBP") ongoing seizure of $58,100 in U.S. Currency belonging to Rustem, Lejla, and Erald

Kazazi. *See* Fed. R. Crim. P. 41(g).

    CBP seized the family's money on October 24, 2017, as Rustem was departing from

Cleveland Hopkins International Airport for Newark, New Jersey, where he would board an

international flight destined for Albania—the Kazazis' former home. Rustem was not arrested;

no one in the family has been charged with any crime. Instead, CBP used civil forfeiture laws to

seize the family's life savings, only later alleging that the money was "involved in a

smuggling/drug trafficking/money laundering operation." Ex. 5: Notice of Seizure at 1.  These allegations are baseless, and CBP is unwilling to defend them in court.  Yet the agency continues to hold the Kazazis' money in violation of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA).  That law requires the government to return seized property, initiate civil forfeiture proceedings, or initiate criminal proceedings within 90 days of the date on which the seizing agency received the property owner's demand for federal court proceedings.  18 U.S.C. § 983(a)(3)(A), (B).  In this case, CBP's deadline expired no later than April 17, 2018, without the government doing any of those things.  Because the government missed the 90-day deadline, CAFRA prohibits any further litigation over the property—in civil or criminal proceedings—and both CAFRA and Attorney General regulations require the government to "promptly" return the property.  *Id.* § 983(a)(3)(B); 28 C.F.R. § 8.13(b).  For the reasons set forth below, this Court should order that remedy without delay.

## MOTION

Movants Rustem Kazazi, Lejla Kazazi, and Erald Kazazi hereby move this Court for an order under Fed. R. Crim. P. 41(g) directing Respondents U.S. Customs and Border Protection, United States of America, Commissioner Kevin McAleenan, Agent Timothy Stark, and Unknown Agents of U.S. Customs and Border Protection to return $58,100 in U.S. currency that Respondents (or their agents) seized from Rustem Kazazi at Cleveland Hopkins International Airport on October 24, 2017.  In the alternative, Movants request an order to the same effect, based on this Court's equitable powers or *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  Movants also request all further relief in law or equity to which they may show themselves entitled.

## BACKGROUND

Rustem and Lejla Kazazi grew up in Albania, married, and had two children there. After the fall of communism, the Kazazis decided they wanted a better life for their children. In 2005, the family was fortunate to receive visas through the State Department's lottery program. They moved to Cleveland and, in 2010, became United States citizens. Ex. 1: Decl. of Rustem Kazazi in Supp. of Rule 41(g) Mot. for Return of Prop. ("Rustem Decl.") ¶¶ 57–60; Ex. 2: Decl. of Lejla Kazazi in Supp. of Rule 41(g) Mot. for Return of Prop. ("Lejla Decl.") ¶¶ 2–3.

In Albania, Rustem had been a police officer and instructor at the national police academy, Rustem Decl. ¶ 58, and Lejla had been a high school science teacher and insurance specialist, Lejla Decl. ¶ 4. But, in the 13 years since immigrating to the United States, for the most part they have worked menial jobs. Rustem's limited proficiency with English has given him few other options. He has worked, for example, as a busboy, custodian, and parking attendant, sometimes holding two or even three jobs at a time. Rustem Decl. ¶ 67. Lejla, on the other hand, has become fluent in English and now works as a language instructor helping more recent immigrants to learn English. Lejla Decl. ¶ 5.

As Rustem and Lejla had hoped, their children have thrived. The Kazazis' adult son, Erald, is currently completing a chemical engineering degree at Cleveland State University, while working as a paid intern for a chemical manufacturing business. Ex. 3: Decl. of Erald Kazazi in Supp. of Rule 41(g) Mot. for Return of Prop. ("Erald Decl.") ¶ 5. In keeping with Albanian tradition, Erald lives with his parents and plans to do so until he is married. Also in keeping with tradition, he contributes substantially to family expenses. *Id.* ¶ 6.

Last year, Rustem began planning a six-month stay in Albania. After years away, he longed to see his extended family. Rustem Decl. ¶ 8. Additionally, the home that the Kazazis

still own in Tirana, Albania was in sore need of repairs—including a new roof, updated plumbing, and updated electrical systems.  *Id.* ¶ 6.  Rustem was also considering buying a home on the Adriatic coast, where he and Lejla hope to vacation in retirement.  *Id.* ¶ 7.  To facilitate these transactions and avoid bank fees, Rustem decided to reduce his family's life savings to cash and bring it with him to Albania.  *Id.* ¶¶ 9–10.

Before Rustem's departure, the Kazazis made cash withdrawals from their bank accounts to support family there, provide for needed home repairs, house hunting, and Rustem's expenses over a six-month stay.  Rustem Decl. ¶¶ 11, 65; Lejla Decl. ¶¶ 7–8; Erald Decl. ¶¶ 36–37, 40–41.  From this money, Rustem packed $58,100 in $100 bills in his carry-on bag.  Rustem Decl. ¶ 12.  Because Rustem is temperamentally detail-oriented and careful with money, he counted the cash several times, separated it into three stacks of $20,000, $19,100, and $19,000 each, and then, after counting again, labeled each stack with the amount it contained.  *Id.* ¶ 13.  He then placed the three stacks in a single envelope and wrote "$58,100" on the outside.  *Id.* ¶ 14.

On the day of his departure—October 24, 2017—Rustem and Lejla drove to the airport together.  *Id.* ¶ 4.  Because Rustem still has difficulty with English, Lejla helped him check in and get to the security checkpoint.  Lejla Decl. ¶ 6.  She then left for work.  Rustem Decl. ¶ 5.

As he was going through security, TSA agents discovered the money in Rustem's bag.  *Id.* ¶¶ 16–18.  They contacted CBP agents, who took Rustem's U.S. passport and driver's license and led him to a small private room.  *Id.* ¶¶ 19–21.  There, they searched Rustem, his clothing, and his personal effects several times, even requiring him to strip naked and searching him head to toe.  *Id.* ¶¶ 23–24.  The agents questioned him rapidly in English.  *Id.* ¶ 20.  He could barely follow what they were asking him.  *Id.* ¶¶ 22, 28–29.  After Rustem repeatedly asked for an

interpreter, the agents told him no interpreter would be provided. *Id.* ¶¶ 20, 22, 29. They also refused to let him contact his family for help. *Id.* ¶ 20.

The agents asked Rustem how much money he was carrying. Confused about how to respond in English, he simply told them "five eight," and pointed to the amount written on the outside of the envelope—$58,100. *Id.* ¶ 30. The agents took this envelope and all the money it contained without counting it, *see id.* ¶¶ 14, 18, 28, 41, and later gave Rustem a receipt for an unstated amount of "U.S. currency," Ex. 4: Custody Receipt for Seized Property; Rustem Decl. ¶¶ 31, 45–46. For all their searching, the agents did not find any evidence of a crime. *Id.* ¶ 41. They did not give Rustem any indication *why* they were seizing the money. *Id.* They did not arrest him. *Id.* ¶ 39. In fact, when Rustem insisted he would not leave the room without his money, the CBP agents tried to force him to board his flight to Newark and, when he protested, they took him to the airport entrance and simply walked away. *Id.* ¶¶ 34–36.

In shock, Rustem called Lejla and told her what had happened. *Id.* ¶ 43. She assured her husband there must be some mistake and that she and Erald would try to sort things out. Lejla Decl. ¶ 10. She encouraged Rustem to continue with his journey, and he did, after the airline rebooked him on a later flight from Cleveland to Newark. *Id.*; Rustem Decl. ¶¶ 47–48. Because Rustem had a long layover in Newark to begin with, *see* Rustem Decl. ¶ 4, he was able to make his scheduled flight to Frankfurt, Germany and from there to Tirana, Albania, *id.* ¶¶ 47–49, 52. However, with only the money in his wallet (less than $1,000), his plans had been dashed. *Id.* ¶¶ 52–55.

While Rustem was still away in Albania, CBP sent him a Notice of Seizure on December 1, 2017, claiming that the amount taken from him had been $57,330 ($770 less than the amount the agents had seized in October). Ex. 5 at 1; Erald Decl. ¶ 9. This document also announced,

for the first time, that the agents had seized the money for being "involved in a smuggling/drug trafficking/money laundering operation." Ex. 5 at 1; *see also* Lejla Decl. ¶ 11; Erald Decl. ¶ 43. The notice informed Rustem that CBP intended to seek civil forfeiture of his money using an internal administrative process. Ex. 5 at 1. And it apprised Rustem of his right to submit a claim to the money and request, instead, that civil forfeiture proceedings be referred to federal court. *Id.* at 3. However, this initial seizure notice included conflicting deadlines for responding. *Id.* With Erald's help, the family contacted CBP about the conflicting dates, Ex. 6 at 4–5; Erald Decl. ¶¶ 9–17, which the agency eventually corrected by sending an amended seizure notice, which set Saturday, January 13, 2018, as the deadline for receiving claims and any demand for federal court action.[1] Ex. 7 at 4. The incorrect seizure amount remained unchanged. *Id.* at 1.

The Kazazis responded to this amended notice on January 3, with Rustem and Lejla submitting joint claims to $32,663 and Erald submitting one for $24,667—a combined $57,330 matching the figure quoted in the seizure notices. *See* Exs. 8–10; Rustem Decl. ¶ 11; Lejla Decl. ¶ 19; Erald Decl. ¶¶ 11, 18, 21–22. The Kazazis each demanded that any civil forfeiture case against their money go to federal court for adjudication, rather than to CBP. Exs. 8–10. On Wednesday, January 10 (prior to the stated January 13 deadline), Erald emailed the family's point of contact at CBP—a paralegal specialist in the agency's Cleveland Office—clarifying that Rustem and Lejla were also submitting claims to the $770 seized from Rustem but *not* included in the seizure notices. Ex. 14 at 2. Attached to this email were two new claims to the additional $770 and two new election-of-proceedings forms. *Id.* at 3–8. That same day, Rustem and Lejla mailed these second claims to CBP, Exs. 12–13; Erald Decl. ¶ 19, and the agency acknowledged

---

[1] As Movants explain below, the agency's Saturday deadline was—by operation of law—automatically extended to include Monday, January 15, 2018.

receipt on January 17, 2018.  Ex. 16 at 1; Erald Decl. ¶ 25.  Giving the government the benefit of

the doubt, that makes April 17 the last possible day on which the government could have

complied with the 90-day deadline.

While the Kazazis eagerly awaited their day in court, they heard several times from CBP

representatives who asked them to withdraw their demand for court action and, instead, to allow

the agency to complete administrative forfeiture proceedings, at which point, these people

assured the Kazazis, they could again ask to go to court.  Exs. 17–19; Erald Decl. ¶¶ 26–30.

Unwilling to countenance any delay, the Kazazis ignored these messages.  Erald Decl. ¶ 29.

Again, on March 30, a CBP attorney in Chicago called Erald and left a voicemail, saying she

wanted to discuss, "whether you want [the case] to go to court or if we could handle this

administratively."  Ex. 20; Erald Decl. ¶ 30.  The attorney urged Erald to call back quickly

because the agency's deadline to begin the court process would expire "within the next week"—

that is, no later than April 6, 2018.  *Id.*  Three weeks later, when still no forfeiture complaint had

been filed, Erald wrote to his contact at CBP to ask why the family's money had not been

returned.  Ex. 21 at 3.  The response was distressingly bureaucratic:  CBP had no idea.  For the

first time, CBP told the Kazazis that it had no control over the case; instead, the U.S. Attorney's

Office was in control.  *See* Ex. 22 at 2.  When Erald asked whom he could contact at the U.S.

Attorneys' Office, the agency claimed that it had no contact there and would not know who was

handling the case until "a decision is made."  Ex. 23 at 2; Ex. 24 at 1

Today, more than seven months since CBP agents unconstitutionally seized the Kazazis'

money and upended their lives, the government *still* has not begun civil forfeiture proceedings.

It cannot do so now, as the deadline to seek forfeiture of the money expired no later than April

17.  For the reasons explained below, the Court should order CBP to return the money.

## ARGUMENT

A motion under Criminal Rule 41(g) is the appropriate means for seeking return of property when the government fails to commence a forfeiture proceeding in a timely manner. The rule provides that a "person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g).  This motion "must be filed in the district where the property was seized." *Id.*  And "[t]he court must receive evidence on any factual issue necessary to decide the motion." *Id.*

Courts—including the Sixth Circuit—have held that Rule 41(g) provides property owners with an equitable remedy when the government fails to initiate civil forfeiture proceedings. *Cf. Brown v. United States*, 692 F.3d 550, 552–53 (6th Cir. 2012) (holding that when a civil forfeiture proceeding *has* been filed, Rule 41(g) does not apply because the claimant has an adequate remedy at law—prevailing in the forfeiture case); *United States v. Sims*, 376 F.3d 705, 708 (7th Cir. 2004) ("The proper office of a Rule 41(g) motion is, before any forfeiture proceedings have been initiated, or before any criminal charges have been filed, to seek the return of property . . . held an unreasonable length of time without the institution of proceedings that would justify the seizure and retention of the property."); *see generally* Stefan D. Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES § 3-8(c) (2d Ed. 2013) (collecting cases holding that "Rule 41(g) is the appropriate vehicle for seeking the return of property never forfeited").  In such cases, "the request for return of the seized property is essentially a civil equitable proceeding, notwithstanding the fact that the motion was styled under Fed. R. Crim. P. 41(e)."[2] *United States v. Duncan*, 918 F.2d 647, 654 (6th Cir. 1990) (internal quotation and alterations

---

[2] "Previously, the subsection addressing motions to return property was Rule 41(e)," but, "[i]n 2002, this subsection was redesignated Rule 41(g) without substantive change." *Brown*, 692 F.3d at 552 (quoting *De Almeida v. United States*, 459 F.3d 377, 380 n.2 (2d Cir. 2006)).

omitted); *see, e.g., Nexus Holdings, Inc. v. Dafcan Fin., Inc.*, 531 F. Supp. 2d 839, 844 (S.D. Ohio 2008) (using the "equitable test applicable to a Rule 41(g) motion" to return money even though the government was actively conducting a criminal investigation implicating the money).

In this case, the limitations period has expired and the government cannot initiate forfeiture proceedings. As a result, the Kazazis have no means of seeking the return of their property other than Rule 41(g)—they cannot win their money back in proceedings that will never commence. For the reasons explained below, this Court should order the government to return the Kazazis' money in full—all $58,100. And, because there will be no later proceedings, the Court should not impose any conditions giving the government access to the money.

### A. The Government Violated The Deadlines Set By CAFRA, And Is Therefore Obligated To Return The Money.

With the Civil Asset Forfeiture Reform Act of 2000, Congress enacted several reforms intended to prevent abuse of the Nation's forfeiture laws. Among the most important of these reforms was the creation of strict deadlines with which the government must comply when initiating forfeiture cases. *See* 18 U.S.C. § 983(a).

Under CAFRA, the government has 60 days after seizing property to send written notice to interested parties. *Id.* § 983(a)(1)(A). Once that notice is sent, property owners have a limited time in which to file a claim (under penalty of perjury) identifying the specific property they are claiming and stating their legal interest in the property. *Id.* § 983(a)(2). The government then has 90 days from the date the claim is received by the seizing agency in which to return the property, file a civil forfeiture complaint, or obtain a criminal indictment that includes an allegation that the property is subject to forfeiture. *Id.* § 983(a)(3)(A), (B).

The 90-day deadline "was considered by the sponsors of CAFRA to be one of its most important reforms." Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES § 7-4(a) (citing

H.R. Rep. No. 106-192 (1999)).  Congress was crystal clear about the consequences of missing the deadline: "[1] the Government *shall* promptly release the property pursuant to regulations promulgated by the Attorney General, and [2] *may not* take any further action to effect the civil forfeiture of such property in connection with the underlying offense."  18 U.S.C. § 983(a)(3)(B) (emphasis added).  Under the first of these provisions, once the 90-day deadline has elapsed, the Attorney General requires that a seizing agency "shall promptly notify the person with a right to immediate possession of the property, informing that person to contact the property custodian within a specified period for release of the property."  28 C.F.R. § 8.13(b).  Under the second provision, the expiration of the deadline means that "the civil forfeiture of the property in connection with the particular underlying offense is forever barred."  *United States v. Real Property Located at 475 Martin Lane*, 545 F.3d 1134, 1141 (9th Cir. 2008); *see also* Cassella, ASSET FORFEITURE LAW IN THE UNITED STATES § 7-5(b) (referring to this provision of Section 983(a)(3)(B) as the "death penalty").

In this case, the government did not comply with CAFRA's 90-day deadline.  Following seizure of the Kazazis' money in October 2017, CBP sent the statutorily required notice in December 2017—within the initial 60-day deadline—claiming that agents had seized $57,330 from Rustem. *See* Ex. 5 at 1.  After some confusion about the deadline that the agency had set for the Kazazis to respond, *see* Ex. 6, CBP sent an amended notice, requiring that claims be received no later than Saturday, January 13, 2018, Ex. 7 at 3.  The fact that the agency chose a Saturday deadline meant that the true deadline was the following Monday, January 15, 2018.[3]  On January 3, the Kazazis submitted their initial claims to the $57,330 identified in CBP's

---

[3] Because CBP's amended seizure notice set a deadline on a Saturday, the official deadline was extended to include Monday, January 15. *See* Fed. R. Civ. P. 6(a)(1)(C).

seizure notices. Exs. 8–10. They also demanded that the CBP halt administrative forfeiture proceedings and refer the case to the United States Attorney for litigation in federal court. *Id.* The return receipt for these claims shows that they were received on January 8 (seven days before the deadline). Ex. 15. On January 10 (five days before the deadline), the Kazazis emailed a paralegal at CBP, Ex. 14 at 1–2, whom both seizure notifications identified as their point of contact, *see* Ex. 5 at 4 & Ex. 7 at 4. This email attached new claims clarifying that the amount the family was claiming was the full $58,100 taken from Rustem, not just the $57,330 identified in the initial seizure notices. Exs. 12–14; *see also* Erald Decl. ¶¶ 19–20. That same day, the Kazazis sent hard copies of their supplemental claims, and again demanded that the case be referred to federal court. Erald Decl. ¶ 19; *see also* Exs. 12–13. The Kazazis do not know when, precisely, CBP received the hard copies in the mail, but they have reason to believe they were received no later than the January 15 deadline. Erald Decl. ¶ 24. First, the Kazazis live less than six miles from CBP's Cleveland office and, in their experience, mailing something that distance within Cleveland does not take five days. *Id.* Second, CBP acknowledged receipt of the second claims on January 17, at 7:26 in the morning, suggesting the claims were received on January 16 or earlier. *See* Ex. 16 at 1; Erald Decl. ¶ 25. As a result, April 17, 2018 is the last conceivable date on which the government could have even arguably met the 90-day deadline.[4] Still, today, no civil forfeiture complaint has been filed.

---

[4] In fact, CBP had received the very same claim forms and election-of-proceedings forms by email on January 10, making April 10, 2018 the true deadline. It might also arguably be said that the deadline expired on one of two earlier dates: April 6, 2018—the date CBP's attorney gave the Kazazis as the deadline for court action (see p. 7); or Monday, April 9—the next business day after 90 days from the date on which CBP received the first set of claims. But it hardly matters which of these dates is correct. Even using the latest conceivable date—the date on which CBP acknowledged receipt of the second set of claims—the deadline is still more than six weeks past.

Nor did the government do any of the things that CAFRA requires a seizing agency to do to extend the deadline. It did not "obtain a criminal indictment containing an allegation that the property is subject to forfeiture." 18 U.S.C. § 983(a)(3)(B)(ii)(I). It did not "take the steps necessary to preserve its right to maintain custody of the property as provided in the applicable criminal forfeiture statute." *Id.* § 983(a)(3)(B)(ii)(II). It did not return the money to the Kazazis "pending the filing of a complaint." *Id.* § 983(a)(3)(A). It did not obtain an extension by "agreement of the parties." *Id.* Nor—to the best of the Kazazis' knowledge—did the government move this Court to "extend the period for filing a complaint for good cause shown." *Id.*; *see, e.g.*, *Real Property Located at 475 Martin Lane*, 545 F.3d at 1141 (holding that a motion to extend the 90-day deadline may be filed *ex parte*). Now that the 90-day window has closed, the government cannot do any of these things. 18 U.S.C. § 983(a)(3)(A) & (B).

What the government *did* do during its 90-day window was press the Kazazis to withdraw their demand for federal court action. Exs. 17–20; Erald Decl. ¶¶ 26–31. In doing so, a lawyer for CBP admitted, on March 30, that the deadline to commence court proceedings would expire "within the next week," as she hurried the Kazazis to decide "whether you want that to go to court or if we could handle this administratively." Ex. 20; Erald Decl. ¶ 30. Of course, the Kazazis had already decided to "go to court," in January, when they formally notified CBP of their demand for federal court action, Exs. 8–14, which was their right under both CAFRA and the agency's instructions, *see* Erald Decl. ¶¶ 29, 31 (explaining that the family ignored these requests because they had no interest in administrative forfeiture proceedings).

The remedy for the government's failure to commence federal court proceedings is plainly spelled out in CAFRA: "[T]he Government shall promptly release the property." 18 U.S.C. § 983(a)(3)(B). Accordingly, the Kazazis' motion should be granted without delay.

**B. The Court Should Return All Of The Seized Money.**

Another troubling dimension of this case is the discrepancy between the amount that Rustem was carrying ($58,100) and the amount CBP says it seized ($57,330). Rustem and Lejla swore that there was a $770 discrepancy in the second of two claims they submitted to the agency. Exs. 12–13. In his attached declaration, Rustem explains that the seized money was composed of only $100 bills, Rustem Decl. ¶ 12, which (to state the obvious) cannot total $57,330. Rustem counted the money no fewer than three times; he carefully sorted it into three stacks; he wrapped it in computer paper and labeled the outside with the total: $58,100. *Id.* ¶¶ 13–14. He placed the envelope in his carry-on bag, along with other personal effects. *Id.* ¶¶ 14–15. The CBP agents took everything in the envelope marked $58,100 on the outside, including Rustem's labels, and the three stacks of $100 bills he had counted as $20,000, $19,100, and $19,000 each. When Rustem protested, the agents gave him a receipt for an unstated amount of "U.S. Currency." *Id.* ¶ 46; *see also* Ex. 1.

In addition to Rustem's testimony, Lejla and Erald both testify that he is careful with money and reliable when it comes to accounting. Lejla Decl. ¶ 9; Erald Decl. ¶ 42. If any doubt remains, the Kazazis have provided additional testimony consistent with their $58,100 figure, including sources of legitimate earnings and withdrawals in at least that amount. *See, e.g.*, Rustem Decl. ¶¶ 61–71; Lejla Decl. ¶ 20; Erald Decl. ¶¶ 36, 38–41, 43–47.

To the extent that the Court doubts the Kazazis' figure, it should hold an evidentiary hearing at which they may testify and cross-examine the CBP agents who carried out the seizure. *See* Fed. R. Crim. P. 41(g) ("The Court must receive evidence on any factual issue necessary to decide the motion."). At present, such a hearing is unnecessary because the Kazazis have presented evidence—in the form of sworn claims, sworn declarations, and bank information—

showing that Rustem was carrying $58,100 at the time of the seizure. There is, therefore, no "factual issue" to be resolved, unless CBP comes forward with some credible evidence supporting its own figure. If the government's response to this motion raises some genuine factual issue (and the Kazazis doubt it will), the Court should give both parties an opportunity to present testimony, after which the Court can make a credibility determination.

### C. The Court Should Return The Money Without Conditions.

Finally, Rule 41(g) provides that "[i]f it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings." Fed. R. Crim. P. 41(g). In this case, there will be no "later proceedings." As explained above, the government "may not take any further action to effect the civil forfeiture of [the Kazazis' money] in connection with the underlying offense." 18 U.S.C. § 983(a)(3)(B). Accordingly, there are no "reasonable conditions" that the Court could impose. The only reason for attaching conditions on the return of the Kazazis' money would be to protect the government from later prejudice, by preserving "access to the property and its use in later proceedings." Fed. R. Crim. P. 41(g). But where, as here, the government is time-barred from any "later proceedings," there is no legitimate basis the government having "access" to or "use" of the Kazazis' money. Just the opposite: By its own actions, the government has forfeited any legal entitlement that it ever had to the Kazazis' money. The government never had a legitimate entitlement to the money—CBP agents unreasonably seized the money without probable cause—but that is of little moment now that the agency is categorically forbidden from pursuing the money regardless of its origins and purposes. Indeed, the law affirmatively requires CBP to return the Kazazis' money, now that the 90-day deadline has elapsed.

Accordingly, the Court should order the return of the money without any conditions.

## CONCLUSION

The Court should grant the Kazazis' motion and order the government to return all $58,100 in United States currency.

Dated: May 31, 2018

Respectfully submitted,

Patrick T. Lewis (0078314)
BakerHostetler LLP
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
P: (216) 621-0200
F: (216) 696-0740
Email: plewis@bakerlaw.com

Wesley Hottot (TX bar no. 24036851)*
Institute for Justice
600 University Street, Suite 1730
Seattle, WA 98101-3150
P: (206) 957-1300
F: (206) 957-1301
Email: whottot@ij.org

Johanna Talcott (CA bar no. 311491)*
Institute for Justice
2 South Biscayne Boulevard, Suite 3180
Miami, FL 33131-1803
T: (305) 721-1600
F: (305) 721-1601
Email: jtalcott@ij.org

*Counsel for Movants*

* *Pro hac vice* motions will be filed

## CERTIFICATE OF SERVICE

I hereby certify that, on this 31st day of May, 2018, I caused to be filed the foregoing Rule 41(g) Motion for Return of Property and the accompanying exhibits in person with the Clerk of Court for the United States District Court for the Northern District of Ohio.

I further certify that on this day, I caused a copy of the foregoing Motion and the accompanying exhibits to be served on the Respondents by certified mail, return receipt requested, at the addresses identified below:

United States of America
c/o Civil Process Clerk
Office of the U.S. Attorney
801 West Superior Avenue, Suite 400
Cleveland, OH 44113-1852

Attorney General Jeff Sessions
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

Agent Timothy Stark and Unknown Agents
U.S. Customs and Border Protection
6747 Engle Road
Middleburg Heights, OH 44130

U.S. Customs and Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229

Commissioner Kevin McAleenan
U.S. Customs and Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229

Patrick T. Lewis (0078314)
*Counsel for Movant*

111776.098901 4824-4664-1767

16